FILED
05/13/2021
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 10, 2021

**STATE OF TENNESSEE v. STEPHEN L. PURCELL, JR.**

**Appeal from the Circuit Court for Lawrence County**
**No. 2018-CR-35327      Stella L. Hargrove, Judge**

_____

**No. M2020-00217-CCA-R3-CD**

_____

A Lawrence County jury convicted the Defendant, Stephen L. Purcell, Jr., of felony reckless endangerment, aggravated assault, especially aggravated kidnapping, aggravated burglary, auto burglary, and theft of property valued at more than $10,000. The trial court imposed an effective twenty-year sentence to be served in the Tennessee Department of Correction. On appeal, the Defendant argues that the evidence was insufficient to support his convictions for reckless endangerment, aggravated assault, and especially aggravated kidnapping. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

John S. Colley, III, Columbia, Tennessee (at trial), and Avery Oaks, Nashville, Tennessee (on appeal), for the appellant, Stephen L. Purcell, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Kim R. Helper, District Attorney General, Pro Tem; Stacey Brakeen Edmonson and Jennifer K. Dungan, Assistant District Attorneys General, Pro Tem, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant forcing his way into the victim's house, as she was leaving for work, assaulting her, and holding her at knife point inside the residence. He eventually forced her outside to her vehicle and attempted to bind her hands inside the vehicle before she escaped to a neighbor's house and called 911. The Defendant took the victim's vehicle and drove to another residence. For these events, a Lawrence County grand jury indicted the Defendant for attempt to commit first degree murder, aggravated assault, especially aggravated kidnapping, aggravated burglary, auto burglary, and theft of property valued at more than $10,000.

At the Defendant's trial, the parties presented the following evidence: on July 5, 2018, the victim lived on Mannin Road in Leoma, Tennessee, with her husband and daughter. The victim testified that she worked third shift at the Maury Regional Medical Center and typically left for work around 5:45 p.m. On July 5, the victim was getting ready for work when she heard a horn sound and thought that someone was clicking the key fob to lock a car door. The victim assumed that it was her husband, a Lawrence County Sheriff's deputy, who had just left the house. She heard the sound again approximately two minutes later and looked out the bathroom window but did not see anything. The victim testified that she finished getting ready for work, opened the back door to leave, and a masked man, later identified as the Defendant, charged at her wielding two knives. She described one of the knives as a black folding knife and the other knife as having a wooden handle and looking like a "buck-skinning knife." The victim screamed and attempted to shut the door, but the Defendant had both hands inside the door, so it slammed on his wrists. She testified that the Defendant tackled her and placed his knee on her back and asked if anyone else was inside the house. The victim said that, although no one else was home, she told the Defendant that her husband was in the shower hoping to scare the Defendant. She said that this did not seem to deter him.

The victim testified that the Defendant held the black knife to her throat after tackling her. He eventually took his knee off of her back, rolled her over, and continued holding the knife to her throat. The victim testified that she began wrestling with the Defendant, and he placed her in a headlock. She then bit him "as hard as [she] could on his right side." The victim testified that the Defendant threw her down and repeatedly punched her in the face. He then got on top of her, and they continued wrestling. The victim said that she took the black knife from the Defendant and stabbed his shoulder, his back, and above his left eye.

The victim testified that the Defendant recovered the knife from her and threatened to "gut [her] like a fish." He dragged her into the living room, using a headlock or choke hold, and then dragged her to the back door and instructed her to lock it. The victim said that she acted as though she was going to lock the door but then opened it and ran outside and down the stairs. The Defendant grabbed her by the hair and forced her back inside the house. The victim testified that the Defendant threw her to the ground, ripping her shirt off. He got on top of her, and they began wrestling again. The victim testified:

> He [again] told me that he was going to gut me like a fish. And then he told me that since I had been acting a fool, that he had to take me to a separate location but that he would bring me back. And then he walked me to the back door and he said, "If you scream, I'm going to slit your throat."

She said that the Defendant had one hand on her throat at the time, and he had the knife to her throat in the other hand. The Defendant then said, "all I want is answers." The victim replied that she did not know anything.[1] He also asked if her husband had any guns in the house. The victim testified that she told the Defendant that the guns were in her husband's patrol car. The Defendant told the victim that he did not believe her, and "he said that he was going to look and if he found them, then he was going to slit [her] throat and leave."

The victim testified that the Defendant told her to pick up her shirt and put it over her face. He then tied it and took her out of the house to her vehicle, a white Ford Explorer. She said: "He continued to choke me and he had []it down three separate times." The victim testified that the Defendant opened the door to her Ford Explorer and placed her in the front seat. He got into the vehicle behind her in the back-passenger seat. The victim testified that she pulled the shirt down from her face and looked back. She saw that her daughter's car seat was tossed to the side, and the contents of her purse were scattered all over the back seat of the vehicle.

The victim testified she was afraid that the Defendant would kill her if she saw his face, so she turned back around and "faced forward." She said that the Defendant instructed her to place her hands behind the headrest, and she complied. The victim testified that she heard the Defendant "messing with something," but he still had his hand on her wrist. She noticed that the door of her vehicle was unlocked, and she opened the door and ran to the home of her neighbor. The victim testified that she heard the Defendant running after her, but she thought that he slipped or hit something. The victim testified that she arrived at her neighbor's house and barged in the front door. She told her neighbor that she had been attacked, and she used her neighbor's phone to call 911.

The State played the 911 phone call for the jury. While talking to the 911 operator, the victim noticed that her vehicle was missing from her driveway. The victim's husband was the first deputy to arrive on the scene, and responders transported her to the hospital by ambulance.

As to her injuries, the victim testified that she had scrapes and knife abrasions on her throat and neck. There was also an "abscess" where the Defendant choked her. The

---

[1] The victim told the 911 operator that the Defendant also kept yelling, "I don't want to hurt you, I don't want hurt you, I just need answers, is Colton [the victim's husband] home."

victim had a busted lip, an abrasion on the side of her nose, and bruising on the side of her temple where the Defendant struck her. She had cuts and scrapes on her leg and ankles caused by the Defendant dragging her up the back steps by her hair when she attempted to escape. She also had bruises covering her legs, chest, and back. The victim testified that hospital employees photographed her injuries, and she remained in the emergency room for a "couple" of hours and was released. Some of her injuries were still visible a few days later, and her husband photographed them. The victim's bag, containing some of her belongings, was later returned to her. An item worn by the Defendant as a mask was also in the bag, and the victim's husband called an investigator back to the house to retrieve it. The victim confirmed that she did not give the Defendant permission to enter her home or vehicle on July 5, 2018.

Johnny Cheatwood, Director of the Emergency Communications District for Lawrence County, testified that on July 5, 2018, a 911 call was received through Giles County from the Defendant. The Defendant told the 911 operator that he had been involved in an incident at the victim's house and that there were two armed men behind the house. He also said the men were wearing masks, and he described their clothing. The Defendant told the 911 operator that he had left the area and no longer saw the men. He also indicated that he was driving through "town" on the way home to meet his mother, and he was trying to get his phone activated.

Patricia Wells, the Defendant's great-aunt, testified that the Defendant arrived at her house on Lambs Ferry Road shortly before 6:00 p.m. on July 5, 2018. She said that the Defendant called her and her husband into the kitchen, and she saw that the Defendant had blood covering his face and shirt. The Defendant asked to use her phone and walked out to the back porch. Ms. Wells testified that Captain Adam Brewer of the Lawrence County Sheriff's Department later arrived at the house, and the Defendant left with him to give a statement. Ms. Wells assumed that the Defendant arrived at her house in the white Ford Explorer that was parked in the yard.

Ms. Wells testified that the following day, July 6, 2018, her husband took the lid off of the trash can on the back porch, and she saw the victim's "name badge" lying on top of the trash bag. She said that a purse, diaper bag, identification, and what appeared to be a credit card was in the trash bag. The couple called investigators to their home, and the investigators took the items.

Investigator President Driver of the Lawrence County Sheriff's Office processed the victim's vehicle, which was located at the Wells's residence on Lambs Ferry Road, for evidence. He found blood stains in the vehicle, a knife, and a pair of zip ties. Investigator Driver later saw the Defendant at the sheriff's office. The Defendant had a cut above his eye, scratches on his right shoulder, a cut on his right arm, and a bite mark on his torso. Investigator Driver also collected the Defendant's clothing and a black pocket knife. He later returned to the Wells's residence and recovered some of the victim's belongings.

Included in those belongings was a soft carry bag that had holes cut in it as if someone had used it for a mask. Investigator Driver admitted that the item was originally given to the victim with her belongings, and he later returned to her residence and retrieved it.

Special Agent Militza Kennedy, a forensic scientist for the Tennessee Bureau of Investigation, biology unit, tested the DNA collected in this case. She determined that DNA recovered from the victim's vehicle, house, and the black mask matched the Defendant's DNA profile. The Defendant's DNA profile was also found on the handle and blade of the knife.

Based upon this evidence, the jury convicted the Defendant of felony reckless endangerment, aggravated assault, especially aggravated kidnapping, aggravated burglary, auto burglary, and theft of property valued at more than $10,000. The trial court imposed an effective twenty-year sentence to be served in confinement. It is from these judgments that the Defendant appeals.

## II. Analysis

The Defendant asserts that the evidence was insufficient to support his convictions for reckless endangerment, aggravated assault, and especially aggravated kidnapping. He does not challenge the remaining convictions. As to the convictions for reckless endangerment and aggravated assault, the Defendant argues that the evidence did not show that the victim was placed in "imminent" danger of death or serious bodily injury or in fear of such danger because, during the 911 call, the victim said that the Defendant yelled, "I don't want to hurt you." The Defendant further argues that the evidence was insufficient to support his conviction for especially aggravated kidnapping because the victim was not unlawfully confined or removed to such a degree that it substantially interfered with her liberty, as the term has been interpreted and defined by the Tennessee Supreme Court. The State responds that the Defendant's convictions for reckless endangerment and aggravated assault were supported by the Defendant's act of holding the knife to the victim's throat and threatening to kill her several times while choking, beating, and dragging her around, placing her in danger of death or serious bodily injury and causing her to fear imminent bodily injury. The State further contends that the evidence was sufficient to support the Defendant's conviction for especially aggravated kidnapping because the proof showed that the Defendant used a deadly weapon, a knife, to knowingly and unlawfully remove and confine the victim in her home and vehicle as to substantially interfere with her liberty. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d

247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus[,] the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

- 6 -

## A. Reckless Endangerment and Aggravated Assault

A person commits reckless endangerment "who recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a) (2018). Reckless endangerment committed with a deadly weapon is a Class E felony. T.C.A. § 39-13-103(b). "Reckless" refers to a person "who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." T.C.A. § 39-11-106(a)(31). For the threat of death or serious bodily injury to be "imminent," the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger. *See State v. Fox*, 947 S.W.2d 865, 866 (Tenn. Crim. App. 1996).

Aggravated assault is defined as "intentionally or knowingly commit[ing] an assault as defined in [T.C.A.] § 39-13-101, where the assault "involve[s] the use or display of a deadly weapon" or "involve[s] strangulation or attempted strangulation." T.C.A. § 39-13-102(a)(1)(A)(iii), (iv). A person commits assault who: (1) Intentionally, knowingly or recklessly causes bodily injury to another; (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative. T.C.A. § 39-13-101.

The evidence presented, viewed in the light most favorable to the State, was that the Defendant attacked the victim in her home and that he choked and repeatedly punched her in the face while holding a knife to her throat. He also dragged her around from room to room in the house, and eventually out to her vehicle. Two different times while the Defendant held the victim at knifepoint, the Defendant threatened to "gut" the victim "like a fish." He also threatened to slit her throat. The victim had abrasions on her throat from the knife and an abscess where the Defendant choked her. These circumstances, particularly a knife being held to her throat, placed the victim in imminent danger of death or serious bodily injury and could easily have caused the victim to reasonably fear imminent bodily injury. The Defendant is not entitled to relief on this issue.

## B. Especially Aggravated Kidnapping

Especially aggravated kidnapping is "false imprisonment, as defined in [Tennessee Code Annotated section] 39-13-302[,] [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" T.C.A. § 39-13-305(a)(1). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a). "[N]othing in the especially

- 7 -

aggravated kidnapping statute requires that the victim be removed for a certain distance or be confined for a certain period of time in order for a defendant's actions to amount to a substantial interference in the victim's liberty." *State v. Turner*, 41 S.W.3d 663, 670 (Tenn. Crim. App. 2000).

Viewed in the light most favorable to the State, the evidence showed that the Defendant's actions substantially interfered with the victim's liberty. The Defendant confined the victim in her house by holding her down with his knee on her back and then holding her in a headlock or choke hold at knifepoint and threatening several times to kill her. At one point, the victim escaped from the house, only to be dragged back inside by the Defendant. Additionally, the Defendant forced the victim outside and into her vehicle where he attempted to bind her hands with zip ties. During each of those confinements, the victim could not leave her house or vehicle of her own free will. Accordingly, the Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

_____

ROBERT W. WEDEMEYER, JUDGE